UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

KELLY K. TINDLE,                        )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        CIVIL NO.  3:12cv872
                                        )
CAROLYN COLVIN, Acting                  )
Commissioner of Social Security,        )
                                        )
        Defendant.                      )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB), and for Supplemental Security Income (SSI).  42 U.S.C. §423(d); 42

1382c(a)(3).  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the

[Commissioner] shall file a certified copy of the transcript of the record including the evidence

upon which the findings and decision complained of are based.  The court shall have the power

to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the [Commissioner], with or without remanding the case for a

rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since March 23,

2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: mood disorder, panic disorder without agoraphobia, obsessive-compulsive disorder (OCD), a history of substance abuse, obesity, asthma, and bilateral chondromalacia of the knees (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967a), as the claimant can frequently or occasionally lift and carry up to 10 pounds; stand and/or walk for about 2 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday with normal breaks.  The claimant can also never climb ladders, ropes or scaffolds; can occasionally climb ramps but never stairs; and can occasionally balance, stoop, kneel, and crouch but never crawl.  There are no issues in regards to manipulative abilities with either the right or left upper extremity.  The claimant must further avoid even moderate exposure to extreme heat or cold; wetness; humidity; environmental irritants, such as fumes, odors, dusts or gases; and poorly ventilated areas.  Moreover, the claimant must avoid even moderate exposure to hazards, such as dangerous moving machinery or unprotected heights.  Additionally, the claimant is limited to simple, routine, and repetitive tasks; and can make only simple work-related decisions.  The claimant cannot do any work that involves directing others, abstract thinking or planning.   The claimant's work must be isolated from the public with only occasional interaction with coworkers and only occasional supervision.  In addition the claimant is only able to adjust to simple, routine workplace changes.

6.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on December 4, 1981 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist  in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569,404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act,
from March 23, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-34).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

 Plaintiff filed her opening brief on July 12, 2013.  On November 27, 2013, the defendant filed a memorandum in support of the Commissioner's decision, and on December 11, 2013, Plaintiff filed her reply.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"? (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff applied for disability benefits in 2010 due to several mental and physical impairments. Plaintiff has a longstanding history of mental illness, and was diagnosed with severe depression with psychotic features as a young adult. She had difficulty sustaining full time work for long periods, and suffered worsening psychiatric symptoms after her daughter died in 2008. Working part time, Plaintiff was forced to stop working in early 2010 after experiencing two car accidents. After examining the claimant, an orthopedic determined she was suffering from chondromalacia patella. Other examining sources documented that Plaintiff had difficulty sustaining her gait. While she awaited hearing, Plaintiff obtained psychiatric treatment, but continued to suffer from severe depression and anxiety. After two administrative hearings, an ALJ denied her claim.

Plaintiff contends that the Commissioner's unfavorable determination should be reversed or remanded. The Plaintiff argues that the ALJ erred at step three by assessing an RFC that is not supported by substantial evidence. The Plaintiff claims that the ALJ improperly dismissed the opinions offered by her treating psychiatric therapist without offering a reasonable, supported basis. The Plaintiff further claims that the ALJ also cherry picked from the facts regarding her physical and mental impairments to support his finding that Plaintiff was not disabled. Because of these alleged errors, the Plaintiff maintains that the ALJ presented an incomplete hypothetical to the vocational expert and rendered his testimony unreliable. Further, the Plaintiff argues that

the ALJ also failed to present her deficiencies with concentration, persistence, and pace to the vocational expert, rendering his testimony regarding the number of jobs Plaintiff could perform unreliable. Finally, the Plaintiff contends that the ALJ erred by then using this testimony to satisfy his step five burden to show Plaintiff could perform other jobs which exist in significant numbers.

The Plaintiff was born on December 4, 1981. At the time of the administrative hearings, she was 29 years of age. (R. at 220) She finished the eighth grade. (Dkt. 14-2 at 74) Plaintiff has never been able to hold a full time job for any significant amount of time, but stopped working her part time job where she averaged only 14 hours each week after experiencing a car accident in 2010. (R. at 274, 289)

The record first documents the Plaintiff's medical treatment during 1997. She underwent a psychiatric evaluation with Dr. Angela Lew in December of 1997 and reported suffering from a depressed mood, impaired concentration, low energy, and suicidal ideation. Dr. Lew noted that she "stabbed her hand with a nail file, placed rubber bands around her neck, attempted to suffocate herself with a pillow, cut her wrist with a knife, and jumped out [ ] of a first floor window." (R. at 398-399) The examiner observed a depressed and constricted affect. (R. at 400) Dr. Lew concluded:

> Kelly has fewer internal resources and below average stress tolerance. Hence, she is likely to find herself continually frustrated and in emotional upheavals due to fewer available resources and inadequate coping skills. In these situations, she is vulnerable to impulsive, disorganized, and acting out behaviors. Kelly is uncomfortable with and quite avoidant of processing her emotions. . . Her current distress is impinging her more cognitively than affectively [ ] such that she presently finds herself overwhelmed by increased ideational activity (which may manifest as hearing voices). As a result of this ideational activity and emotional distress, she has difficulties sleeping, concentrating, or relaxing (is tense, anxious, and worries much of the time). Some problems in her thinking is [sic] evident

6

which may contribute to distortions of reality and predispose her toward
maladaptive behaviors. Under stress, she may experience some psychotic
symptoms (auditory hallucinations, depersonalization) as a result of relying on
primitive defenses. (R. at 401-402)

Dr. Lew diagnosed major depressive disorder (moderate to severe with psychotic features), acute

post-traumatic stress disorder (PTSD), and ruled out attention deficit hyperactivity disorder

before assessing a GAF score of 40. (R. at 402) In March of 1998, Plaintiff was diagnosed with

bipolar disorder and PTSD. (R. at 395)

During a primary care consultation in February of 2008, an examiner observed that

Plaintiff was anxious and prescribed Klonopin. (R. at 422) At a follow up in June of 2008,

Plaintiff complained that she was "going crazy" after the death of her daughter. The examiner

noted that she was crying before diagnosing anxiety/depression, prescribing Klonopin and

Zyprexa, and referring Plaintiff for psychiatric counseling. (R. at 421) During a primary care

consultation in July of 2009, Plaintiff reported that she was "not doing ok." She complained of

difficulty sleeping, diminished appetite, mood swings, panic attacks, and tearful episodes. The

examining physician chose to increase her dosage of Klonopin and prescribe Abilify. (R. at 432)

In January of 2010, Plaintiff complained of pain in her back, diminished energy, "lots of

anxiety," and headaches. The examiner noted that she was tearful and her thoughts were "all

over." She diagnosed anxiety and PTSD, and also increased Plaintiff's dosage of Klonopin. (R.

at 431) Plaintiff received treatment in the emergency room for a motor vehicle accident on

January 13, 2010. (R. at 472-484) At a primary care follow up a week later, Plaintiff complained

of pain in her neck, shoulder, back, and pelvis. The examining physician observed tenderness

with palpation and motion. Suspecting a pelvic fracture, she prescribed Flexeril and Percocet. (R.

at 430) Diagnostic imaging studies of Plaintiff's pelvis returned unremarkable results. (R. at 472)

7

Plaintiff presented for a physical therapy consultation in February and described pain in her left shoulder and lower back. The therapist documented pain with motion in the lumbar spine, diminished strength in both hips and tenderness in the cervical and lumbar spine. (R. at 469-471)

Throughout the first half of 2010, Plaintiff presented for regular primary care consultations. She was treated for lumbago and prescribed Vicodin as well as Klonopin. (R. at 405-415) On May 4th, Plaintiff complained to her primary care physician of pain from her "spine to both knees." (R. at 434) On July 7, 2010, at the request of the DDS, Plaintiff met with Dr. Alan Wax for a consultative psychological evaluation regarding her pending claim for disability benefits. She complained of worsening psychiatric symptoms and described anxiety, depressed moods (feelings of helplessness, hopelessness, and "sad and blue"), tearful episodes, and social isolation. (R. at 497) She reported having regular panic attacks with "shortness of breath and a rushing through my body like I'm going to choke" as well "big" panic attacks every couple of months. Plaintiff also indicated she counted tiles in the ceiling while waiting on the examiner. Dr. Wax observed that Plaintiff "ambulated with difficulty and could not make it up a flight of stairs." He wrote, "The claimant completely broke down and it took her several minutes to compose herself. She started having a mild panic attacks [sic], breathing heavily throughout the evaluation, alternated crying, etc." (R. at 498) Dr. Wax concluded that Plaintiff "appeared to be extremely nervous and depressed" before diagnosing major depressive disorder (recurrent, severe, without psychotic features), panic disorder without agoraphobia, and PTSD. He assessed a current GAF score of 49. (R. at 500)

The next day, Plaintiff presented to Dr. Peter Sices for a consultative physical examination regarding her pending claim. She complained of chronic pain in her knees, back,

and neck as well as difficulty lifting, twisting, or standing for more than thirty minutes at a time. (R. at 504) Dr. Sices observed rapid speech, diminished motion in the lumbar spine, an inability to walk on the toes or heels or perform a tandem gait, and tenderness as well as "significant" crepitus in both knees. He documented that her gait was "normal in form with mild slowing; this appears stable but non-sustainable just due to her appearance of discomfort." Dr. Sices diagnosed "significant osteoarthritis of both knees" with a poor prognosis. (R. at 505) On July 8th, Plaintiff visited Dr. Thomas Akre and complained of bilateral knee and back pain. She claimed her knee pain worsened with moving, lifting, or standing. Dr. Akre observed global tenderness and extraarticular swelling bilaterally as well as trace effusion and positive McMurray's test on the left. He diagnosed knee pain and synovitis before administering an injection of cortisone in Plaintiff's right knee. (R. at 538-540)

Dr. Donna Unversaw, a psychological consultant for the DDS, performed a Psychiatric Review Technique in July of 2010. In doing so, she concluded Plaintiff's psychiatric impairments were not severe and imposed no limitations regarding her ability to maintain concentration, persistence, or pace. (R. at 508-520, 518) Dr. Deal, a medical consultant for the DDS, then performed a physical RFC assessment and determined the claimant could lift and/or carry 20 pounds occasionally and ten pounds frequently and sit, stand or walk for 6 hours in an eight hour day with some additional postural limitations. (R. at 522-529)

Plaintiff returned to Dr. Akre for a follow up on July 20, 2010. She complained of persistent pain and swelling, difficulty extending her legs, grinding in the knees, and difficulty walking and climbing stairs due to pain. Dr. Akre observed global tenderness bilaterally and crepitus on the right. He diagnosed chondormalacia patella and referred Plaintiff for

physical therapy. (R. at 541-542) In late July of 2010, Plaintiff began presenting to Bob Adams, a licensed clinical social worker at the Lincoln Therapeutic Partnership. (R. at 604-605, 609) She continued to meet with him for weekly individual therapy sessions throughout 2010; Mr. Adams attempted to challenge Plaintiff's irrational beliefs. (R. at 607-618)

Plaintiff began a course of physical therapy in August of 2010. The therapist noted that she "walks slowly, she leans to the right, and she has bilateral genu valgus deformity with right greater than left." She observed pain with motion and crepitus bilaterally and established a goal of improving the claimant's gait. (R. at 544, 695) At a follow up with Dr. Akre in September, Plaintiff reported experiencing pain in both hips, both knees, and the back. Dr. Akre documented tenderness to palpation in the lumbar spine and both knees, pain with motion in the lumbar spine and right hip. He diagnosed low back pain, bilateral hip pain, and bilateral chondromalacia patella. (R. at 690-692) Plaintiff had another physical therapy consultation in December. She complained of neck pain, back pain, and swelling and tenderness in both knees. The therapist observed decreased hip extension, a compensated Trendelenburg gait, decreased hip rotation, and a poor slumped posture. She documented limited motion in the knees, hips, and lumbar spine due to pain, a positive Faber test and SI scan, diminished lower extremity strength, increased patellar tendon thickening bilaterally, and tenderness to palpation with patellar mobilization. (R. at 688-689).

On January 19, 2011, Mr. Adams completed a questionnaire regarding Plaintiff's ability to perform work-related activities on a sustained basis. He opined that Plaintiff had moderate limitations concerning her ability to understand, remember, and carry out simple instructions, make judgments on simple, work related decisions, and interact appropriately with

supervisors and co-workers, and "marked" limitations regarding her ability to interact appropriately with the public and respond appropriately to usual work situations and to changes in a routine work setting. (R. at 551-553) During February, Mr. Adams concluded Plaintiff exhibited a current GAF score of 49. (R. at 640) The claimant also presented for psychiatric evaluation and treatment in February. She met with Mark Snell, a LCSW at Oaklawn Psychiatric Center, on February 8, 2011. She complained of mood swings, panic attacks, and "some symptoms of OCD where she counts tiles and chairs. . ." (R. at 718) Mr. Snell observed:

> Kelly is a moderately overweight white female whose manner of relating was very anxious and pressured. Her speech was very pressured during the session. It was hard for her to respond to questions as she was so nervous and wanted to get her story out. Her affect was labile and she would cry and then laugh at times. Her mood was depressed and anxious. Thought content was unremarkable although she skipped around quite a bit. She had a difficult time concentrating and completed the paperwork very quickly without paying attention. (R. at 719)

Mr. Snell diagnosed mood disorder, panic disorder, obsessive-compulsive disorder, and personality disorder before assessing a current GAF score of 45. (R. at 719)

At an orthopedic follow up in January of 2011, Plaintiff complained of pain in her lower back, upper back, and neck. She claimed she could not sit for more than an hour without getting up and experienced pain "in almost all joints" after only 20 minutes of walking. (R. at 685) Dr. Akre documented paripatellar tenderness and moderate crepitation of the right knee. (R. at 686-687) In March, Plaintiff met with Dr. Vivek Prasad for a psychiatric medication review consultation. Dr. Prasad noted that the claimant "is managed on Klonopin [ ] and Zyprexa" but still complained of anxiety. The physician documented that Plaintiff exhibited "a labile affect, crying profusely." (R. at 708-709) He diagnosed PTSD, cocaine dependence in full remission, and borderline traits. He added Saphris to the Plaintiff's medication regimen. (R. at 710) At a

11

therapy session in March, Mr. Adams worked with Plaintiff on "process[ing] boundaries with family and how to solve problems with family system." (R. at 634) Plaintiff returned to Dr. Akre for an orthopedic follow up in May. She complained of lower back pain radiating into both knees as well as bilateral knee pain. Dr. Akre observed tenderness in the lumbar and thoracic spine, tenderness in both knees, moderate crepitation in the right knee, and pain with motion in both knees. (R. at 682-683)

On June 13, 2011, Mr. Adams completed another questionnaire regarding Plaintiff's mental functioning. (R. at 703-707) Noting that he had met with Plaintiff for weekly hour long sessions since August of 2010, the clinician explained that Plaintiff is "overly preoccupied with detail" and "has problems with managing her mood states." Although he documented "moderate success" of Plaintiff's treatment, Mr. Adams felt her current GAF score was 49. (R. at 703) He opined that Plaintiff is unable to meet competitive standards regarding her ability to maintain attention for a two hour segment, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, and deal with normal work stress. He further indicated she would be seriously limited but not precluded from understanding, remembering, and carrying out very short and simple instructions, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, and getting along with co-workers without unduly distracting them or exhibiting behavioral extremes. (R. at 705) Mr. Adams also felt Plaintiff

12

would require more than four absences each month. (R. at 707)

On January 13, 2011, Plaintiff appeared unrepresented at a hearing in Valparaiso, Indiana before  ALJ Mario Silva of the Valparaiso, Indiana Office of Disability Adjudication and Review (ODAR). (R. at 89-119) She testified that she was unable to work due to bipolar disorder, anxiety, and chronic pain. (R. at 101) Plaintiff explained, "When it comes to working I'm okay for a little while, but then something will usually go bad and it's usually a misunderstanding like I didn't understand something that was said. And from there it just always downhill." (R. at 101-102) She added that "I struggle daily." (R. at 102) After questioning Plaintiff about her medical treatment, Judge Silva postponed the hearing to obtain additional medical records. (R. at 108-114)

Plaintiff appeared with counsel for another hearing on June 29, 2011. Leslie Lloyd, a vocational witness, also appeared at the hearing. (R. at 40-87) First, the ALJ questioned Plaintiff. When asked about her past work experience, Plaintiff testified that "I lose most of my jobs." (R. at 47) She indicated that she worked full time in 2002 and "was there for a couple of years, but they worked with my bi-polar and my anxiety levels really well. They let me pull off the floor. I was the server and when I couldn't serve when my anxiety levels were too high they'd let me work in the back room." (R. at 47-48) Plaintiff reported completing the eighth grade. (R. at 50) Counsel then questioned Plaintiff. Plaintiff testified that she needed reminders to take her psychiatric medications. (R. at 54-55) She reported suffering from regular panic attacks despite these medications. She stated, "I get very, very scared very, very easy and I am very bad nervous problem and sometimes it's hard for me to say things like right now." (R. at 56) Plaintiff indicated that her symptoms worsened after the death of her daughter in 2008. (R. at 56) She

13

reported getting into "a lot of personal confrontations." (R. at 57) Plaintiff described difficulty with attention and concentration, testifying, "there's so many things running through my head that I can't find out what I'm trying to think about." (R. at 57) Plaintiff explained that she is distracted by her need to "count everything." (R. at 58) She described chronic pain in her back, knees, and hips. (R. at 59-60) She testified that "there's [sic] days I can't move, I have to do my stretches sometimes before I get out of the bed." (R. at 61)

    The vocational expert, Dr. Lloyd, then testified. Mr. Lloyd first indicated that Plaintiff had no past relevant work. (R. at 76) The ALJ asked the witness to consider the following hypothetical individual with the claimant's age, education, and work experience but limited to lifting and carrying ten pounds frequently or occasionally, standing or walking for two hours in an eight hour day, sitting for six hours in an eight hour day, and occasionally climbing ramps, balancing, stooping, kneeling, crouching. The person could never climb ladders, rope, scaffolds, or stairs and never crawl. She would need to avoid even moderate exposure to wetness and humidity, environmental irritants such as fumes, odors, dusts, or gases, and poorly ventilated areas. Mentally, the person would be limited to "simple routine and repetitive tasks" with only simple work related decisions and would be unable to perform work requiring her to direct others or perform abstract thought or planning. She would need to be isolated from the public with only occasional supervision and occasional interaction with co-workers. The person would be able to adjust to simple routine work place changes. (R. at 76-78) Asked if these limitations permitted the performance of other work, the VE responded affirmatively and listed the following positions: surveillance system monitor (4,000 jobs in Indiana), companion (1,200 jobs in Indiana), and general office clerk (2,000 jobs in Indiana). (R. at 78-79) The VE testified that a

14

person who missed two or more days of work each month would be unable to sustain any unskilled work. (R. at 79) He stated that a person would "have to have at least 90 percent attention to task in all three jobs I identified." (R. at 83)

On August 15, 2011, Judge Silva issued an unfavorable decision. (R. at 22-39) As noted above, at step three, the ALJ determined that Plaintiff did not have any impairment or combination of impairments that met or equaled the severity of any listed impairment. (R. at 25-27) At the second half of step three, the ALJ determined the claimant retained the capacity to sustain sedentary, simple work. (R. at 27-32) At step four, the ALJ concluded Plaintiff had no past work. (R. at 32) At step five, the ALJ found that the claimant was able to perform the positions of surveillance system monitor, a companion, and a general office clerk. (R. at 33) Plaintiff's claim for benefits was denied upon these step five findings. (R. at 33-34)

In support of reversal or remand of the ALJ decision, the Plaintiff first argues that the Commissioner erred at step three by improperly evaluating the opinion evidence. The Social Security regulations require ALJ's to evaluate "medical opinions" offered by treating sources by considering the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(c); Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006); Scott, 647 F.3d at 740; Moss v. Astrue, 555 F.3d 556, 561 (7th Cir.2009). Opinions from licensed clinical social workers who treat a claimant are not "medical opinions" that are entitled to controlling weight, but "should be evaluated on key issues such as impairment severity and functional effects" with consideration of the same factors. SSR 06-09p; Cruse v. Comm'r of Social Sec., 502 F.3d 532, 541 (6th Cir. 2007); Phillips v. Astrue, 413 Fed.

15

Appx. 878, 884 (7th Cir. 2010). "[G]iven the importance and relevance of the information reflected in records authored by other medical sources, the ALJ must articulate a reasonable basis for rejecting other medical source opinions, which basis is grounded in substantive evidence in the record." Frame v. Astrue, 2012 U.S. Dist. LEXIS 118704 at *26-27 (S.D. Ind. 2012); Tooley v. Astrue, 2013 U.S. Dist. LEXIS 78836 at *20 (N.D. Ill. 2013).

In the present case, the ALJ conferred Mr. Adams' opinion "little weight because he is not an acceptable medical source pursuant to the Regulations and because the restrictions are inconsistent with the record as a whole." (R. at 32) The Plaintiff argues that although the ALJ's citation of Mr. Adams' status justified a refusal to confer his opinions controlling weight, it does not satisfy his duty to evaluate the opinion with the regulatory factors in order to assess the "severity and functional effects" of Plaintiff's psychiatric impairments. SSR 06-09p ("after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source"); Cruse, 502 F.3d at 541; Frame, 2012 U.S. Dist. LEXIS 118704 at *26-27.

The Plaintiff further argues that the ALJ's second claim that the limitations assessed by Mr. Adams "are inconsistent with the record as a whole" is simply not supported by substantial evidence. To support this assertion, the ALJ first wrote that "the claimant would be limited to simple tasks . . . The claimant is also only able to adjust to simple and routine workplace changes. . . The claimant has moderate limitations in social functioning, so she would be limited to only occasional interaction with coworkers and supervision." (R. at 32) The Plaintiff contends that the ALJ's recitation of his assessment of the claimant's mental RFC to show that Mr.

16

Adam's opinion is inconsistent with other evidence is circular logic that cannot reasonably
support his decision to confer this opinion little weight in formulating Plaintiff's mental RFC.
See Bjornson v. Astrue, 671, F.3d 640, 645 (7th Cir. 2012) (disapproving of passage regarding
claimant's that "implies that ability to work is determined first and is then used to determine the
claimant's credibility. That gets things backwards.")

    Next, the Plaintiff argues that the ALJ's assertion that "the claimant's last employer
noted that she was very good at following simple instructions; got along well with others; and
could handle changes in the work setting" does not reasonably demonstrate that Mr. Adams'
opinions were inconsistent with the evidence of record. (R. at 32) Although the claimant's
previous employer felt she had no difficulty with the mental demands of the work she was
performing, the ALJ ignored the portion of the report indicating the claimant only worked
approximately 14 hours each week for this employer. (R. 274) Mr. Adams, on the other hand,
offered an opinion regarding the claimant's ability to perform "work-related activities on a
sustained basis" in January of 2011. (R. at 551) In June of 2011, Mr. Adams completed another
questionnaire concerning Plaintiff's ability to perform work related activities "on a day-to-day
basis." He opined that Plaintiff was unable to meet competitive standards when it came to her
ability to perform several tasks "effectively and on a sustained basis in a regular work setting."
(R. at 705) See 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00(C) (claimant's social
functioning and concentration, persistence and pace must both be assessed by evaluating ability
to perform tasks "independently, appropriately, effectively, and on a sustained basis"); SSR
96-8p ("RFC is an assessment of an individual's ability to do sustained work-related physical and
mental activities in a work setting on a regular and continuing basis. 'A regular and continuing

basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.")

The ALJ added that "Mr. Adams further found that the claimant's ability to handle issues and control her anger improved with therapy." (R. at 32) The Seventh Circuit has held that an ALJ is not permitted to "cherry-pick" from a claimant's treatment notes to support a refusal to confer treating source opinions proper weight and, thus, a denial of benefits. In <u>Scott v. Astrue</u>, for example, the court concluded it was reversible error for an ALJ to reject a treating source opinion by highlighting the claimant's improvement while ignoring his ongoing struggle with symptoms. 647 F.3d 734, 739-740 (7th Cir. 2011) (citing <u>Denton v. Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010)). The court also noted, "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in [the claimant's] treatment notes." <u>Id</u>. at 739-740.

The Plaintiff claims that the ALJ in the present case ignored the evidence indicating that Plaintiff continued to suffer from disabling psychiatric symptoms despite the "progress" she was making in dealing with issues and controlling her anger.  Plaintiff started meeting with Mr. Adams in July of 2010, and continued to meet with him for weekly individual therapy sessions throughout 2010. (R. at 604-605, 609, 607-618) Despite this course of treatment, on January 19, 2011, Mr. Adams opined that the claimant still had moderate limitations concerning her ability to understand, remember, and carry out simple instructions, make judgments on simple, work related decisions, and interact appropriately with supervisors and co-workers, and "marked" limitations regarding her ability to interact appropriately with the public and respond appropriately to usual work situations and to changes in a routine work setting. (R. at 551-553) In June of 2011, Mr. Adams reiterated that Plaintiff continued to suffer from significant mental

limitations regarding her ability to sustain the mental demands of simple work activity. (R. at 703, 705)

This court agrees with Plaintiff that, in contrast to the ALJ's implication that Plaintiff's psychiatric impairments improved with treatment, the medical evidence of record documents the claimant's persistent psychiatric symptoms and supports Mr. Adams' opinions. Dr. Wax, the consultative psychological examiner, wrote in July of 2010 that "[t]he claimant completely broke down and it took her several minutes to compose herself. She started having a mild panic attacks [sic], breathing heavily throughout the evaluation, alternated crying, etc." (R. at 498) Dr. Wax concluded that Plaintiff "appeared to be extremely nervous and depressed" before diagnosing major depressive disorder (recurrent, severe, without psychotic features), panic disorder without agoraphobia, and PTSD. He assessed a current GAF score of 49. (R. at 500) After she underwent months of psychiatric therapy, another LCSW evaluated the claimant in February of 2011 and noted that her "manner of relating was very anxious and pressured. Her speech was very pressured during the session. It was hard for her to respond to questions as she was so nervous and wanted to get her story out." He also documented that "[h]er affect was labile and she would cry and then laugh at times. Her mood was depressed and anxious. Thought content was unremarkable although she skipped around quite a bit. She had a difficult time concentrating. . ." (R. at 719)

One month later, Dr. Vivek Prasad observed that she exhibited "a labile affect, crying profusely" and added Saphris to her medication regimen in hopes of alleviating her continuing symptoms. (R. at 708-709) The ALJ's finding that Plaintiff made progress in handling issues and controlling her anger cannot reasonably justify his finding that her treating psychiatric therapist's

19

opinions were inconsistent with the record as a whole. The ALJ thus failed to "build an accurate and logical bridge from the evidence to his conclusion" that Mr. Adams' opinions regarding Plaintiff's mental functioning capacity were entitled to little weight. Clifford, 227 F.3d at 872.

Next, Plaintiff argues that the Commissioner erred at step three by assessing an RFC that is not supported by substantial evidence. The Plaintiff again contends that the ALJ erred by cherry picking from the facts to support a finding that Plaintiff was not disabled. The Social Security regulations direct an ALJ to evaluate the medical evidence, resolve conflicts in the record, and determine a claimant's RFC. 20 C.F.R. §§ 404.1527, 416.927; SSR 96-8p. In arriving at an RFC finding, an ALJ has a duty to discuss "all of the relevant medical evidence," set forth a "thorough discussion and analysis of the objective medical and other evidence," "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe,'" (emphasis added) and provide a "logical explanation" of the effects symptoms have on the individual's ability to work. An RFC must reflect the claimant's ability to perform on a regular and continuing basis. SSR 96-8p.

The Seventh Circuit mandates that an ALJ's determination "must be based [ ] upon all of the relevant medical evidence in the record." Garfield v. Schweiker, 732 F.2d 605, 609 (7th Cir. 1984). While an ALJ need not discuss every document in the record, he "may not select only the evidence that favors his ultimate conclusion." Id. This means that an ALJ "may not simply ignore evidence," Myles v. Astrue, 582 F3d. 672, 676 (7th Cir. 2009), ignore "entire lines of contrary evidence," Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012) (internal citations omitted), or "cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596, F.3d 419, 425 (7th Cir. 2010). When

20

the court is unable to discern whether the ALJ considered the record as a whole, remand is necessary. Id.; Zurawski v. Halter, 245 F.3d 881, 888-89 (7th Cir. 2001); Smith v. Apfel, 231 F. 3d 433, 438 (7th Cir. 2000) ("The ALJ's failure to consider the evidence of dizziness alone precludes us from evaluating whether substantial evidence existed to support the ALJ's finding") (internal quotations omitted).

In the present case, as noted above, the ALJ determined Plaintiff suffered from the severe impairments of mood disorder, panic disorder without agoraphobia, obsessive-compulsive disorder. (R. at 24) He concluded these impairments permitted Plaintiff to sustain simple, routine, and repetitive tasks, make simple work related decisions, adjust to simple, routine workplace changes, and occasionally interact with supervisors and co-workers but precluded her from having exposure to the public or performing work requiring her to direct others or complete abstract thinking or planning. (R. at 28) The ALJ dismissed DDB consultants' opinions that Plaintiff's psychiatric impairments were non-severe because "they are inconsistent with the record." (R. at 31) The ALJ chose to rely on his own interpretation of the objective medical evidence to assess Plaintiff's mental RFC. (R. at 28-31).

The Plaintiff argues that the evidence discussed by the ALJ regarding her mental functioning "does not present the whole picture." Anderson v. Astrue, No. 10-cv-91 PPS, 2011 WL 4899990 at *7 (N. D. Ind. October 14, 2011). The ALJ never mentioned Plaintiff's treatment for her psychiatric impairments prior to July of 2010. (R. at 29-30) Dr. Lew concluded in 1997 that Plaintiff "is vulnerable to impulsive, disorganized, and acting out behaviors" and "has difficulties sleeping, concentrating, or relaxing (is tense, anxious, and worries much of the time)." (R. at 401-402) During a primary care consultation in February of

2008, an examiner observed that Plaintiff was anxious and prescribed Klonopin. (R. at 422) In

July of 2009, Plaintiff reported that she was "not doing ok." She complained of difficulty

sleeping, diminished appetite, mood swings, panic attacks, and tearful episodes. The examining

physician chose to increase her dosage of Klonopin and prescribe Abilify. (R. at 432) In January

of 2010, Plaintiff complained of pain in her back, diminished energy, "lots of anxiety," and

headaches. The examiner noted that she was tearful and her thoughts were "all over." She

diagnosed anxiety and PTSD, choosing to increase Plaintiff's dosage of Klonopin. (R. at 431)

The ALJ ignored all of this probative evidence.

      The ALJ also ignored Mr. Snell's evaluation of Plaintiff in February of 2011, months

after she began receiving psychiatric therapy with Mr. Adams. Mr. Snell wrote:

> Kelly is a moderately overweight white female whose manner of relating was
> very anxious and pressured. Her speech was very pressured during the session. It
> was hard for her to respond to questions as she was so nervous and wanted to get
> her story out. Her affect was labile and she would cry and then laugh at times.
> Her mood was depressed and anxious. Thought content was unremarkable
> although she skipped around quite a bit. She had a difficult time concentrating
> and completed the paperwork very quickly without paying attention. (R. at 719)

Mr. Snell diagnosed mood disorder, panic disorder, obsessive-compulsive disorder, and

personality disorder before assessing a current GAF score of 45. (R. at 719) The ALJ never

mentioned this highly probative clinical evidence when assessing Plaintiff's response to

treatment or her mental RFC.

      The ALJ also mischaracterized other evidence regarding Plaintiff's psychiatric

impairments to support his finding that she was not experiencing symptoms as severe as she

alleged. He discussed the consultative psychological examination by Dr. Wax, conceding that

this specialist documented Plaintiff "was extremely upset at one point" and seemed to have a

panic attack. But the ALJ left out of his discussion the psychologist's observation that Plaintiff presented as "extremely nervous and depressed" as well as his conclusions that she suffered from severe depression and that her current GAF score indicated serious symptoms or functional limitations. (R. at 500) The ALJ also wrote that in March of 2011 a doctor at Oaklawn "noted that the claimant's condition was managed by medication," (R. at 30), but ignored the physician's observations that Plaintiff complained of persistent anxiety and exhibited "a labile affect, crying profusely" despite her medications, as well as his decision to add Saphris to her medication regimen. (R. at 708-709) The ALJ wrote that later that month "Mr. Adams indicated that the claimant had learned how to handle the problems she had with her family." (R. at 30) But the relevant treatment note reveals that Plaintiff had not "learned how to handle" these problems, merely that Mr. Adams worked with her on "process[ing] boundaries with family and how to solve problems with family system." (R. at 634) This court agrees with Plaintiff that the ALJ's selective discussion of these medical facts cannot constitute a logical and accurate bridge in support of his findings regarding Plaintiff's mental RFC.

The ALJ concluded Plaintiff suffered from the severe impairments of obesity, asthma, and bilateral chondromalacia of the knees. (R. at 24) He concluded she was able to stand or walk for two hours in an eight hour day despite this impairment. (R. at 27) The ALJ discounted the opinions offered by the state agency medical consultants and interpreted the medical evidence to determine Plaintiff could stand or walk enough to perform sedentary work. (R. at 29, 31)

However, again, the ALJ cherry picked from the facts to support a finding that Plaintiff could stand or walk for two hours each day and sustain the exertional demands of sedentary work. The ALJ ignored medical evidence demonstrating Plaintiff had an impaired gait due

to her bilateral knee impairment. An agency interviewer initially observed that Plaintiff had difficulty with sitting, standing, and walking, noting that she "walked very slowly and appeared to be in severe pain." (R. at 246) During her August 2010 course of physical therapy, Plaintiff's therapist noted that she "walks slowly, she leans to the right, and she has bilateral genu valgus deformity with right greater than left." She observed pain with motion and crepitus bilaterally and established a goal of improving Plaintiff's gait. (R. at 544, 695) During another physical therapy evaluation in December of 2010, a therapist observed decreased hip extension, a compensated Trendelenburg gait, decreased hip rotation, and a poor slumped posture. She further documented limited motion in the knees, hips, and lumbar spine due to pain, a positive Faber test and SI scan, diminished gross lower extremity strength, increased patellar tendon thickening bilaterally, and tenderness to palpation with patellar mobilization. (R. at 688-89) The ALJ wholly ignored all of this medical evidence regarding Plaintiff's difficulty walking.

The ALJ discussed Dr. Sices' examination of Plaintiff in July 2010, noting that he observed her gait to be "normal with only mild slowing due to her alleged discomfort." (R. at 31, 29) However, the ALJ never mentioned Dr. Sices' opinion that Plaintiff's gait was "stable but nonsustainable." (emphasis added) (R. at 505) He failed to "consider and address" this medical source opinion and "explain why the opinion was not adopted." SSR 96-8p. As the Plaintiff notes, even if this evidence does not constitute a medical source opinion, it constitutes highly probative objective evidence regarding Plaintiff's ability to stand or walk on a sustained basis. Clearly, the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion" that Plaintiff could sustain the assessed RFC. Clifford, 227 F.3d at 872 (citations omitted). Although an ALJ need not address every piece of evidence, remand is warranted when

24

the court is unable to discern whether the ALJ considered the record as a whole.  <u>Denton</u>, 596,

F.3d at 425; <u>Zurawski</u>, 245 F.3d at 888-89.

     Next, the Plaintiff contends that the ALJ erred by failing to present Plaintiff's deficiency

with concentration, persistence, and pace to the vocational expert. The burden of proof is on the

Plaintiff during steps one through four of the sequential evaluation, and only after a claimant has

reached step five does the burden shift to the Commissioner. <u>Clifford v. Apfel</u>, 227 F.3d 863,

868 (7th Cir. 2000). When questioning a VE, an ALJ is required to orient the witness to the

totality of a claimant's limitations. <u>O'Conner-Spinner v. Astrue</u>, 627 F.3d 614, 619 (7th Cir.

2010); <u>Simila v. Astrue</u>, 573, F.3d 503, 520 (7th Cir. 2009); <u>Indoranto v. Barnhart</u>, 374 F.3d 470,

474 (7th Cir. 2004); <u>Young v. Barnhart</u>, 362, F.3d 995, 1003 (7th Cir. 2004). The hypothetical

question to the VE "must fully set forth the claimant's impairments to the extent that they are

supported by the medical evidence in the record." <u>Herron v. Shalala</u>, 19 F.3d 329, 337 (7th Cir.

1994). When an ALJ poses "a hypothetical to the VE based upon a RFC which [is] based upon

incomplete medical evidence . . . the VE's testimony [is] inaccurate and the burden [is] not

satisfied." <u>Williams v. Massanari</u>, 171 F. Supp.2d 829, 834 (N.D. Ill. 2001); <u>see also</u> <u>Brown v.</u>

<u>Chater</u>, 913 F. Supp. 1210, 1216 (N.D. Ill. 1996) (remanding where hypothetical failed to

include pain which was indicated by the medical evidence).

     In <u>O'Connor-Spinner</u>, the court remanded an unfavorable decision because the ALJ's

hypothetical question did not supply the VE with information adequate to determine whether the

claimant could perform other work in the national economy. "Our cases, taken together, suggest

that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is

to include all of them directly in the hypothetical." 627 F.3d at 619. "Among the limitations the

VE must consider are deficiencies of concentration, persistence, and pace." <u>Id</u>. The court held that "limiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace." <u>Id</u>. at 620. Because "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity," the court wrote that "the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." <u>Id</u>. at 620-21.

In present case the ALJ determined Plaintiff had moderate difficulties regarding her ability to maintain concentration, persistence, or pace. (R. at 26-27) He discounted the DDB psychological consultants' opinions that Plaintiff only had mild limitations in this domain. (R. at 27, 31) At the hearing, the ALJ asked the VE to assume the hypothetical person would be limited to "simple routine and repetitive tasks" with only simple work related decisions and would be unable to perform work requiring her to direct others or perform abstract thought or planning. She would need to be isolated from the public with only occasional supervision and occasional interaction with co-workers. The person would be able to adjust to simple routine work place changes. (R. at 76-78) However, the ALJ failed to propose any limitations regarding Plaintiff's ability to sustain her concentration, attention, or pace. (R. at 76-78) Accordingly, "it is not clear whether the hypothetical . . . would cause the VE to eliminate positions that would pose significant barriers to someone with the applicant's . . . problems in concentration, persistence, and pace." <u>O'Connor-Spinner</u>, 627 F.3d at 620. This court agrees with the Plaintiff that the ALJ relied on testimony based on incomplete medical evidence. Therefore, the ALJ

failed to satisfy his step five burden to show other jobs Plaintiff can perform.  Accordingly, a remand is appropriate on this basis as well.

Conclusion

On the basis of the foregoing, this case is hereby REMANDED to the Commissioner.

Entered: February 19, 2014.

s/ William C.  Lee
William C. Lee, Judge
United States District Court